UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TODD M. JOHNSON, SR., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:00CV1556(DFM) |
| | : | |
| RONALD RAPICE, | : | |
| | : | |
| Defendant. | : | |

## RULING ON POST-TRIAL MOTIONS

Pending before the court are the defendant's motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) and 50(b). (Docs. #72, 80.)

The plaintiff, Todd Johnson, Sr., brought this action against the defendant, Ronald Rapice, under 42 U.S.C. § 1983. The plaintiff alleged that the defendant suspended and later terminated his employment with the City of Bridgeport in unlawful retaliation for plaintiff's exercise of his rights under the First Amendment. Specifically, the plaintiff alleges that the defendant retaliated against him for a January 7, 1999 letter the plaintiff wrote to the defendant about the City of Bridgeport's administration.

After a two-day trial, the jury returned a verdict in the plaintiff's favor and awarded him $11,700 in compensatory damages and $1,000 in punitive damages. (Doc. #79.) The defendant moves for judgment as a matter of law.

## I.  __PROCEDURAL HISTORY__

On August 16, 2000, the plaintiff commenced this action
against the City of Bridgeport, Joseph Ganim and Ronald Rapice
("Rapice").  The defendants moved for summary judgment on January
16, 2002.  (Doc. #28.)  Magistrate Judge Thomas P. Smith
recommended that summary judgment be granted in favor of all
defendants.  (Doc. #42.)  On September 11, 2002, the district
court (Squatrito, J.) approved and adopted the recommendation and
granted the defendants' motion for summary judgment.  (Doc. #44.)
The plaintiff appealed.  (Doc. #46.)

The Second Circuit Court of Appeals upheld the grant of
summary judgment as to Ganim and the City of Bridgeport but
reversed the ruling as to Rapice.  See Johnson v. Ganim, 342 F.3d
105 (2d Cir. 2003).  The Court first considered whether the
plaintiff had met his burden of alleging a First Amendment
retaliation claim.  The Second Circuit determined that, contrary
to the district court's finding, the letter "did not threaten
violence" and "was speech on a matter of public concern and
entitled to First Amendment protection."  Johnson, 342 F.3d at
113-114.  The Court noted that this did not end the inquiry.  A
government employer may take action, even against speech on a
matter of public concern, if:

> (1) the employer's prediction of the disruption that
> such speech will cause is reasonable;

> (2) the potential for disruption outweighs the value of

2

the speech;[1] and

> (3) the employer took the adverse employment action not
> in retaliation for the employee's speech, but because
> of the potential for disruption.

Id. The Second Circuit stated that "[b]ecause the speech at

issue here substantially involved matters of public concern, the

government must make a stronger showing of potential interference

with operations." Id. at 115 (internal citation and quotation

marks omitted). The court found that factual questions existed

as to "whether [the plaintiff's] speech had the potential to

cause disruption" and whether the plaintiff's "suspension and/or

termination was based on the potential for disruption rather than

because of his speech." Id. at 115. In other words, the Court

concluded that factual disputes "create[d] a triable issue as to

whether Johnson was suspended and/or fired in retaliation for

writing the letter." Id. at 116.

Finally, the Second Circuit considered the defendant's

qualified immunity defense, concluding that:

> [t]he prohibition against suspending or terminating
> employees for their speech has been clearly established
> since 1968. Therefore, Rapice may prevail on his
> qualified immunity defense only if it was objectively
> reasonable for him to believe that his conduct did not
> violate Johnson's rights.

Id. (internal citations and quotation marks omitted). The Court

---

[1]The second factor is the so-called Pickering balancing test.
See Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Johnson, 342
F.3d at 114.

held that summary judgment was inappropriate because factual issues existed as to "whether [the defendant] acted with retaliatory motive in taking action against plaintiff." <u>Johnson</u>, 342 F.3d at 117.[2]  The Court of Appeals vacated the district court's order granting summary judgment in favor of Rapice and remanded the case for further proceedings.  On October 5, 2004, the case was referred to the undersigned for all further proceedings pursuant to 28 U.S.C. § 636(c).  (Doc. #55.)  It was tried to a jury on August 2 and 3, 2005.

## II.  <u>FACTUAL BACKGROUND</u>

The plaintiff, Todd Johnson, was employed as a custodian for the City of Bridgeport beginning in 1992.  (Doc. #83, Tr. 8/2/05 at 26.)  He was active in his union and at one point was elected as a union official.  (Tr. 8/2/05 at 27-28.)  Although he was initially a political supporter of Mayor Joseph Ganim, he later became convinced that the mayor and his administration were corrupt.  (<u>Id.</u> at 29.)  Plaintiff was outspoken in his criticism of Ganim and the City's administration, frequently participating in protests, calling into talk radio shows, and speaking out to his coworkers. (<u>Id.</u> at 29-30.)

---

[2]The Court specifically noted that if plaintiff's factual allegations about his contentious relationship with the City administration, including Rapice, were assumed to be true, and if the defendant did not know of any history of workplace violence, then "it cannot be said as a matter of law that Rapice's conduct was objectively reasonable."  <u>Id.</u> at 117.

4

The defendant, Ronald Rapice, was a Labor Relations Officer for the City of Bridgeport. (Id. at 132.) The defendant testified that he first met the plaintiff in 1996 or 1997, when the plaintiff was in the Labor Relations office demanding to see some files or documents. (Id. at 155.) The plaintiff was yelling and cursing at a secretary, and the defendant told him to leave. (Id.) He denied telling the plaintiff never to come back to the office again. (Id.) The defendant also had contact with the plaintiff when advising him in filing one or two grievances against the City. (Id. at 156.) At another point, the defendant was charged with investigating a pair of anonymous letters received by plaintiff's supervisor about the plaintiff.[3] (Id. at 156-61.)

The defendant received a letter from the plaintiff dated January 7, 1999. (Tr. 8/2/05 at 162-63; Pl's Ex. 5; Def's Ex. 6.) The letter stated, in its entirety:

> To Whom it may Concern:
>
> I recommend the Ganim administration send thier [*sic*] Labor Relations Officers and 75% of thier [*sic*] supervisors (the appointed, not tested ones) to the seminar about: "Violence in the Work Place" which will be held Jan 27, 1999 in South Norwalk by Linda Maloney 1-203-840-0294.

---

[3]The anonymous letters purported to be from coworkers of the plaintiff who were uncomfortable with the plaintiff's vicious and angry criticism of his supervisors and of Mayor Ganim. (Def.'s Ex. 8a, 8c.) The letters indicated that plaintiff's coworkers found his manner threatening and were afraid of him. (Id.)

While the Ganim Regiment is there, they should ask
[the instructor] IF:

Harassment, fear, intimidation, discrimination,
demotion, transfer, favoritism, stealing overtime,
and union busting, in general, "CAN CAUSE" VIOLENCE
IN THE WORKPLACE.

Well isn't that what happened with the W.P.C.A.?
Protests, assaults, shootings, I'm glad Mayor
Ganim's privatization effort was such a success.  I
understand P.S.G. Corporation has operated in the
Red since the takeover?  Good job Joe!

Its [*sic*] time for change?
Its [*sic*] time to put the blame where it belongs?

                    For the honest union workers,
                    Todd M. Johnson, Sr.

     C.C. U.S. Attorney's Office
          Mayor Ganim
          Labor Relations (Ron Rapice)

(Id.)  The plaintiff sent copies of the letter to the defendant,

to Mayor Ganim and to the United States Attorney's Office. (Tr.

8/2/05 at 36-37.)[4]

     The defendant testified that, upon reading the letter, he

was concerned that the plaintiff might be threatening to engage

in workplace violence.  (Id. at 163-165, 207.)  After receiving

the letter and discussing it with his supervisor, Edmund

Winterbottom, the defendant called the plaintiff and his union

representative into defendant's office on January 26, 1999 to

---

[4]On January 19, 1999, the plaintiff wrote another letter to
the City's Civil Service Commission, complaining about nepotism and
discrimination in relation to his ex-wife's application for a
typist position.  (Pl. Ex. 6.)

discuss what the plaintiff meant by the letter.[5]  (Id. at 164-
68.)  However, he testified that the plaintiff was unwilling to
explain the letter and behaved "bizarre[ly]," turning his back to
the other meeting participants and cursing the Ganim
administration under his breath. (Id. at 164-168, 207.)  Having
received no satisfactory explanation, the defendant, in
consultation with Winterbottom, suspended the plaintiff for 30
days.  (Tr. 8/2/05 at 168; Pl's Ex. 1A; Def's Ex. 2.)  The
defendant sent the plaintiff a letter ordering him to report to
the Employee Assistance Program ("EAP") and undergo an
independent psychiatric examination. (Pl's Ex. 1A; Def's Ex. 2.)
He was told that he could not return to work until EAP pronounced
him fit for duty. (Id.)

     After his suspension, the plaintiff began picketing outside
City Hall.  (Tr. 8/2/05 at 113.)  Nonetheless, the plaintiff
reported to the EAP and subsequently underwent a full-day
psychiatric evaluation by Dr. Charles Opsahl, a licensed clinical
psychologist.  (Tr. 8/2/05 at 47-48, 172.)  In a March 25, 1999
report, Dr. Opsahl summarized the results of his examination of
the plaintiff.  (Def's Ex. 1.)

     Dr. Opsahl began his report by noting that "Mr. Johnson was

---

[5]In a subsequent letter suspending the plaintiff, the
defendant referred to this meeting as a "disciplinary hearing."
(Pl.'s Ex. 1A, Def.'s Ex. 2.)  The defendant testified that the
union representative was there to represent the plaintiff because
it was a disciplinary hearing.  (Tr. 8/2/05 at 164-68, 192-94.)

a pleasant and willing participant" who was responsive and cooperative despite having told Dr. Opsahl that he was there "under protest." (Def's Ex. 1.) The plaintiff told Dr. Opsahl that he grew up in an abusive family, with an alcoholic father, and that he himself had a long history of alcohol and drug abuse, with related incidents of violence. The plaintiff also told Dr. Opsahl that, prior to losing his pistol license 1986 or 1987, he had a collection of approximately one hundred firearms.[6]

The plaintiff reported that he had been sober since June of 1987 and periodically had been seeing a psychologist, Dr. Steinfeld, for twelve years for issues related to his drinking as well as violence. He said that he continued to attend Alcoholics Anonymous meetings.

The plaintiff told Dr. Opsahl that his ex-wife currently had a restraining order against him because "someone kicked in her back door but I denied doing this and the judge did not believe me." He also reported that, after an altercation with another motorist at a traffic light about a year earlier, he had punched the other driver's windshield and had been summoned to court for a breach of peace charge. He told Dr. Opsahl that he had been picketing near City Hall since his suspension.[7] Dr. Opsahl also

---

[6]The plaintiff worked for the Remington Arms Company at that time.

[7]He mentioned that people frequently brought him food while he was picketing, but before he ate it, he would throw some of it to

reported plaintiff's claim that he was not attempting to threaten anyone in the January 7, 1999, letter but was "trying to warn them that on a daily basis different people are walking around like time-bombs."

Dr. Opsahl's report lists a series of tests that he administered to the plaintiff.[8]  Based on his evaluation,  Dr. Opsahl concluded that "Mr. Johnson's history, as well as his current level of impulsivity, certainly raise the question of his propensity to lose control and attempt to harm either himself or someone else."  (Id.)  He "strongly recommended" that Johnson "engage in intensive psychiatric treatment with an eye toward increasing his self-control, decreasing his impulsivity, and helping him to take responsibility for his own behaviors," prior to returning to work. (Id.)[9]

_____

the squirrels to make sure they did not "drop dead," because "you can't be too careful nowadays."

[8]He noted that "[o]n formal psychological measures, Mr. Johnson showed a tendency toward avoiding self-disclosure.  This may signify a characterological evasiveness or an unwillingness to divulge matters of a personal nature."

[9]From his evaluation, Dr. Opsahl also concluded that the plaintiff was deeply insecure, "has an exaggerated need for affection and attention," is "quite distrustful of others," "sees the world as a threatening and rejecting place" and responds by "strik[ing] out in anger as a defense against being hurt," shifts the blame for his problems to other people and "accepts little responsibility for his own behavior," "is non-conforming and resentful of authority," and is prone to "erratic and unpredictable" behavior and impulses.  (Def's Ex. 1.)  He found that Johnson "shows angry resentment toward those he views as being critical and disapproving," and "may vacillate among social

The defendant testified that he reviewed Dr. Opsahl's report and was quite concerned about it. In particular, he was concerned about the plaintiff's history of violence, the recent restraining order, the altercation with another motorist, and the plaintiff's mention of his gun collection. (Tr. 8/2/05 at 173-74.)

The plaintiff refused to undergo the treatment recommended by Dr. Opsahl.[10] (Tr. 8/2/05 at 106, 177.) Instead, he sent the defendant a letter from his own psychologist, Dr. George Steinfeld. (Tr. 8/2/05 at 48-50, 81, 177-78.) Dr. Steinfeld's letter stated that he had been working with the plaintiff "sporadically" for approximately 15 years. (Pl's Ex. 7A.) Dr. Steinfeld's letter indicated that he had "seen [the plaintiff's ] development over the years from a drug and alcohol abusing person with a tendency toward physical abuse when he was drinking, to a man who has been clean and sober for the past 12 years." (Pl's Ex. 7A.) Dr. Steinfeld noted that "the anger which emerged when [the plaintiff] was drinking is no longer present." (Id.)

---

withdrawal, sullen passivity, and explosive anger." (Id.) Dr. Opsahl further found that the plaintiff "experiences a constant and confusing undercurrent of tension and anger," and suffers from "paranoid and suspicious ideation" and possibly "a thought disorder." (Id.)

[10]The plaintiff testified that William Hoey, a counselor at EAP who went over Dr. Opsahl's report with him, told him that he would have to undergo "inpatient" treatment in a "mental facility" for thirty days.

The plaintiff believed the defendant should rely solely on Dr. Steinfeld's letter in determining whether he was fit for duty. (Tr. 8/2/05 at 93.) The defendant testified that he called Dr. Steinfeld and learned that Dr. Steinfeld had not seen the plaintiff in over a year and that he had not conducted the same tests as Dr. Opsahl. (Id. at 180-81.) In light of this, he was comfortable with Dr. Opsahl's report. (Id.)

On May 11, 1999, the defendant met with the plaintiff and spoke with him regarding his refusal to follow the EAP recommendations. (Pl's Ex. 1C; Tr. 8/2/05 at 181-84.) As a result of the plaintiff's refusal to comply, the plaintiff was not cleared for duty. (Id.) The defendant told the plaintiff that instead of following the EAP recommendations, he could select a doctor of his choice to conduct another evaluation. (Id.) The plaintiff refused.[11] (Doc. #84, Tr. 8/2/05 at 99.) On June 3, 1999, the defendant had a formal meeting with the plaintiff and his union representative and again offered the plaintiff the opportunity to go to an EAP counselor or another doctor of his choice. (Pl's Ex. 1D, Tr. 8/2/05 at 186-87.) After the plaintiff again refused the offer, the defendant terminated his employment by letter dated June 3, 1999. (Id.)

---

[11]The defendant testified that, sometime after this meeting, the defendant saw the plaintiff outside the building and asked him to come in for a one on one discussion where he again made the same offer to the plaintiff. (Tr. 8/2/05 at 100, 185-86.)

The termination letter referred to the fact that the defendant had talked to the plaintiff "on several occasions while you were out 'picketing' City Hall" and noted that when the city offered to pay for a doctor of his choice, "you again refused, making your customary threats against the Mayor." (Id.)

At the close of evidence, the jury was given a verdict form with the following question: "Did the plaintiff Johnson prove by a preponderance of the evidence that his speaking out on matters of public concern in the January 7, 1999 letter was a substantial or motivating factor in the defendant's decision to suspend or terminate his employment?" The jury answered in the affirmative.

The verdict form also included the following special interrogatories to be answered if the jury found for the plaintiff:

1.  Did the defendant Rapice prove by a preponderance of the evidence that it was reasonable for him to predict that the plaintiff's January 7, 1999 letter would cause or had the potential to cause disruption in the workplace?

2.  Did the defendant Rapice prove by a preponderance of the evidence that the plaintiff's suspension or termination were not in retaliation for the plaintiff's January 7, 1999 letter but because of the actual disruption or the potential for disruption in the workplace?

(Doc. #79.) The jury answered "no" to Interrogatory 1, and "yes" to Interrogatory 2. (Id.)

The defendant challenges the jury verdict on the grounds that: (1) there is insufficient evidence to support the jury's

12

finding that the suspension or termination were motivated by the content of the plaintiff's letter; (2) the balancing test required by <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968) compels judgment in his favor; (3) insufficient evidence exists to support the award of punitive damages; and (4) he is entitled to qualified immunity.  (Doc. #80.)

## III. <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. 50, judgment as a matter of law is only appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue."  Fed. R. Civ. P. 50(a); <u>Merrill Lynch Interfunding, Inc. v. Argenti</u>, 155 F.3d 113, 120 (2d Cir. 1998).  "[A] court may properly grant judgment as a matter of law where viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached."  <u>Merrill Lynch</u>, 155 F.3d at 120.  More specifically, judgment as a matter of law is granted when:

(1)  there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture; or

(2)  there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against [him].

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (quoting Cruz v. Local Union No. 3 of the Int'l Bhd of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir. 1994)) (internal quotation marks omitted).

## IV.  DISCUSSION

The court now turns to the defendant's Rule 50 motions (docs. #72, 80).

### A.  Retaliatory Motive

The defendant first argues that judgment should enter in his favor because there was no legally sufficient evidentiary basis for a reasonable jury to find that the plaintiff's termination was motivated by the plaintiff's speech.  Specifically, the defendant argues that the plaintiff presented no evidence that his termination was in retaliation for the political content of the letter.  Instead, he argues, the evidence showed that the plaintiff's termination was prompted by the defendant's perception that the plaintiff's letter threatened workplace violence and by the plaintiff's refusal to either explain his letter or attend the treatment recommended by EAP.

"In order to establish a First Amendment retaliation claim, plaintiffs must prove that: (1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse

14

employment decision." <u>Skehan v. Village of Mamaroneck</u>, 465 F.3d 96, 106 (2d Cir. 2006) (citing <u>Gronowski v. Spencer</u>, 424 F.3d 285, 292 (2d Cir. 2005); <u>Sheppard v. Beerman</u>, 94 F.3d 823, 827 (2d Cir. 1996); <u>Lewis v. Cowen</u>, 165 F.3d 154, 163 (2d Cir. 1999). A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus. <u>Cobb v. Pozzi</u>, 363 F.3d 89, 108 (2d Cir. 2003) (internal citation and quotation marks omitted.") Whether the speech addresses a matter of public concern is a question of law to be decided by the court. <u>Skehan</u>, 465 F.3d at 106 (citing Gronowski, 424 F.3d at 292); <u>Reuland v. Hynes</u>, 460 F.3d 409, 415 (2d Cir. 2006).[12]

If a plaintiff makes this required showing, "the adverse action nevertheless does not violate the employee's rights if the employee's speech is reasonably likely to disrupt the effective functioning of the office, and the employee is fired to prevent

---

[12]In addition, plaintiff must show that the defendant "was personally involved in the alleged constitutional deprivations." <u>Skehan</u>, 465 F.3d at 106 (internal citation and quotation marks omitted). The defendant argues in his motion that judgment should be entered in his favor because Edmund Winterbottom, and not he himself, was the decisionmaker. The defendant also contends that the plaintiff failed to prove his allegation that the defendant was expressly authorized by Ganim to suspend and terminate the plaintiff. However, the evidence demonstrated that the defendant was "personally involved" in the plaintiff's suspension and termination.

this disruption." <u>Reuland</u>, 460 F.3d at 415(internal citations and quotation marks omitted).  The court then applies the <u>Pickering</u> balancing test, which requires the government to show "that the employee's interest in free speech is outweighed by the employers' interest in avoiding disruption." <u>Id</u>.

The plaintiff was not required to directly prove retaliatory intent on the part of the defendant.  Instead, it was enough for him to show that he engaged in protected speech, which was followed by an adverse employment decision that the employer cannot justify as being prompted by concerns of workplace disruption.  The plaintiff has done that here.  The evidence showed that the plaintiff had union ties, had been active in his union, had filed multiple grievances, and was an outspoken and public critic of the Bridgeport city government and its mayor.  Between his suspension and his termination, he picketed outside City Hall and, he says, was vocal and public in his protests.  The Second Circuit held, as a matter of law, that his letter of January 7, 1999 was protected speech about a matter of public concern.  There is no question that this protected speech was followed by an adverse employment decision-- plaintiff was suspended and subsequently terminated.  As the Second Circuit noted, the defendant's "sarcastic" reference to the plaintiff's "picketing" outside City Hall and his reference to the plaintiff's "customary threats against the Mayor" are also

indicative of retaliatory purpose.  See Johnson v. Ganim, 342
F.3d 105, 116 (2d Cir. 2003).

Although it is true that a plaintiff may not rely on mere
conclusory assertions of retaliatory motive, the court finds that
the plaintiff produced sufficient evidence "to demonstrate that
[his] version of what occurred was not imaginary." Cobb v.
Pozzi, 363 F.3d 89, 108 (2d Cir. 2003).  The jury's determination
that the political content of the plaintiff's letter was a
substantial or motivating factor in the defendant's decision to
suspend or terminate the plaintiff was supported by the
evidence.[13]

B. Pickering Balancing

The defendant next argues that he is entitled to judgment as
a matter of law under the Pickering balance analysis.
Specifically, he argues that it was reasonable for him to believe
that there was a threat of workplace disruption because of the
apparent threat of violence in plaintiff's letter, because of
plaintiff's refusal to explain the letter and because of
plaintiff's odd behavior at their meeting.  As the Second Circuit

---

[13]The defendant also argues that the plaintiff improperly
presented evidence about Joseph Ganim's corruption in an effort to
link the defendant to that corruption.  The defendant's concerns
are unwarranted.  The court strictly limited testimony about the
Ganim administration and corruption charges, see United States v.
Ganim, 2006 U.S. Dist. LEXIS 26569 (D. Conn. 2006), to evidence
relevant to the plaintiff's claims of political retaliation arising
out of his criticism of that administration.

noted, the plaintiff's letter did not include any express threat, and the plaintiff had no history of workplace violence.  The jury determined that the defendant's perception of the letter as disruptive to the workplace was not reasonable.[14]

There was no evidence that the plaintiff sent the letter to any coworkers or in any way published the letter, so there was no danger of the letter causing "the type of 'drum banging'- in the office or otherwise- necessary to potentially disrupt administration operations."  Johnson v. Ganim, 342 F.3d 105, 115 (2d Cir. 2003).  The defendant testified that the workplace was disrupted because people who saw the letter were concerned, but it was the defendant himself who showed the letter to others in the office.

Based on the evidence presented at trial, the jury reasonably could have found that there was no threat in the letter.  The jury also could have reasonably determined that the plaintiff's refusal to explain himself was a result of his perception that the disciplinary hearing and subsequent meetings

_____

[14]The defendant argues that the court should disregard the jury's finding that the defendant's disruption concerns were unreasonable, because the jury's verdict and its responses to the special interrogatories were contradictory.  The jury's responses are not inconsistent– the jury clearly returned a verdict holding that the letter was a substantial factor in either the suspension or termination or both, although it also apparently found, in a special interrogatory, that fear of workplace disruption was a factor in either the suspension or termination or both.  The jury's finding that the defendant's disruption concern was unreasonable is not contradicted by the other responses.

were intended as political intimidation.[15]

The jury's determination that the fear of disruption was unreasonable is supported by the evidence. Based on the jury's determination that the defendant's fear of disruption was unreasonable, the court need not reach the <u>Pickering</u> balancing test.

C. <u>Qualified Immunity</u>

The defendant next argues that he is entitled to qualified immunity for his conduct. Municipal officials are entitled to qualified immunity if "(1) the legal right said to be violated was not clearly established at the time of the defendant's conduct; or (2) the defendant's action was objectively reasonable in light of the clearly established legal rules then in effect." <u>Skehan v. Village of Mamaroneck</u>, 465 F.3d 96, 107 (2d Cir. 2006)(internal citations omitted).

The Second Circuit, reviewing the defendant's qualified immunity claim at the summary judgment stage, held that "[t]he prohibition against suspending or terminating employees for the content of their speech has been clearly established since 1968." <u>Johnson</u>, 342 F.3d at 116 (internal citations omitted). The

_____

[15]The jury also could have determined that defendant's own conduct undermined his claim that he was concerned about the plaintiff's potential for violence, since there was no evidence that the defendant alerted law enforcement or even building security. Indeed, on one occasion, the defendant saw him outside picketing and, wanting to talk to him, brought him into the office for a meeting.

defendant's argument that the right was not clearly established fails in light of the Second Circuit's decision.

The defendant next argues that it was reasonable for him to believe that his conduct did not violate plaintiff's rights, because he thought it was proper for him to view the plaintiff's letter as a threat.  The jury found that the defendant's view of the letter was unreasonable, and the evidence supports their finding.  The evidence can be viewed as showing that the letter did not contain a threat, that the plaintiff had no history of workplace violence, that at the time of the suspension the defendant knew of nothing to suggest that the plaintiff had a propensity towards workplace violence[16], and that the defendant suspended and then terminated the plaintiff, all because he wrote an ill-phrased and politically controversial letter that posed the question of whether corruption and injustice in the workplace could lead to workplace violence.  In light of the jury's finding that the defendant's concern about disruption was unreasonable, the court finds that it was not reasonable for the defendant to believe that his conduct would not violate the plaintiff's First Amendment rights.  The defendant is therefore not entitled to qualified immunity.

---

[16]Although the defendant testified that he had in mind the two anonymous letters from plaintiff's co-workers, the two unsigned letters describing the defendant as angry were not sufficient evidence that the plaintiff was likely to engage in workplace violence.

D.  <u>Punitive Damages</u>

Finally, the defendant argues that punitive damages are not warranted because his conduct, even if wrongful, was not willful, malicious or motivated by evil motive or intent.  The jury awarded the plaintiff $1,000 in punitive damages.

Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983); <u>see also</u> <u>New Windsor Volunteer Ambulance Corps., Inc v. Meyers</u>, 442 F.3d 101, 121 (2d Cir. 2006).  "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'"  <u>New Windsor Volunteer Ambulance Corps., Inc</u>, 442 F.3d at 121 (2d Cir. 2006)(quoting <u>Kolstad v. American Dental Ass'n</u>, 527 U.S. 526, 538 (1999) (internal quotation marks omitted)).

The defendant contends that he believed in good faith that Johnson might engage in workplace violence and was attempting to prevent such an outcome.  The jury, however, rejected his argument that he reasonably feared disruption to the workplace.

The court does not mean to imply that punitive damages are appropriate any time that a plaintiff has proven retaliatory motive.  However, the jury was instructed to determine "whether the conduct is so extreme and outrageous that actual damages are

inadequate to punish the wrongful conduct" and to consider the deterrence effect of punitive damages. (Doc. #84, Tr. 8/3/05 at 107.) The jury's determination that punitive damages were appropriate is supported by the evidence.

## V.   __CONCLUSION__

For all the foregoing reasons, the defendant's Rule 50(b) Motion for Judgment After Trial (doc. #80) and Motion for Judgment as a Matter of Law (doc. #82) are DENIED.

SO ORDERED this 30th day of March, 2007 at Hartford, Connecticut.

___/s/_____
Donna F. Martinez
United States Magistrate Judge